UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| B.I.C., <br><br> Petitioner, <br><br> v. <br><br> NATHALIE R. ASHER, et al., <br><br> Respondents. | NO. C16-132-MJP-JPD <br><br> REPORT AND RECOMMENDATION |

## **INTRODUCTION**

This is a habeas action pursuant to 28 U.S.C. § 2241. Petitioner, a native and citizen of Somalia, presented himself at the United States border in August 2015 and asked to apply for asylum. After representing that he was 17 years old, he was transferred to the custody of the Office of Refugee Resettlement ("ORR"), the agency within the Department of Health and Human Services ("HHS") that is responsible for the care and custody of unaccompanied children detained by the Department of Homeland Security ("DHS"). Eventually, he was placed in a long-term foster home in Portland, Oregon. In December 2015, ORR officials concluded that petitioner is, in fact, over 18 and transferred him to the custody of U.S. Immigration and Customs Enforcement ("ICE"), which detained him at the Northwest Detention Center in Tacoma, Washington.

REPORT AND RECOMMENDATION - 1

On January 28, 2016, petitioner initiated the instant habeas action against Nathalie R. Asher, ICE Seattle Field Office Director; Jeh Johnson, DHS Secretary; Sylvia M. Burwell, HHS Secretary; Ivonne Velazquez, ORR Federal Field Specialist Supervisor; Maria Riedel, ORR Federal Field Specialist; Lowell Clark, Warden of the Northwest Detention Center; and DHS, ICE, HHS, and ORR. Dkt. 1. He requests, among other things, release from DHS custody and a declaration that ORR's age determination is in violation of federal law. *Id.* at 18.

Currently before the Court is petitioner's motion for a temporary restraining order, which was filed on February 1, 2016. Dkt. 3. He seeks (1) immediate return to his foster family and (2) an order barring respondents from relying on ORR's age determination. Dkt. 3. The Court ordered service and briefing, specifically directing respondents to address why alternatives to detention, such as electronic monitoring, were not appropriate for petitioner. Dkt. 4. On February 3, 2016, ICE released petitioner on electronic monitoring, thus mooting the Court's question regarding alternatives to detention, and he returned to his foster mother. Dkt. 6-1 at 1. Because petitioner has been released, respondents maintain that his motion for temporary restraining order should be denied. Dkt. 6. In his reply, petitioner asserts that he is still entitled to immediate relief. Dkt. 8.

Having carefully considered the parties' submissions, the balance of the record, and the governing law, the Court concludes that oral argument is unnecessary and recommends that petitioner's motion for temporary restraining order be DENIED. The Court also sets a briefing schedule on the merits of petitioner's habeas petition.

REPORT AND RECOMMENDATION - 2

## LEGAL BACKGROUND

Before the creation of DHS in 2002, the care and placement of unaccompanied alien children[1] ("UAC") in the United States was the responsibility of the Office of Juvenile Affairs in the former Immigration and Naturalization Service ("INS"). *See F.L. v. Thompson*, 293 F. Supp. 2d 86, 96 (D.D.C. 2003). In 2002, INS's functions were split between the enforcement of federal immigration law, which was left to DHS, and the care of immigrant children, which was left to HHS. *See* Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002) ("HSA"). Those laws were amended again in 2008 through the William Wilberforce Trafficking Victims Protection Act ("TVPRA"), further separating DHS's and HHS's functions by placing the care and custody of children under HHS's jurisdiction and clarifying the respective roles and responsibilities of the two agencies with respect to UACs.

A.   **The Homeland Security Act of 2002**

With the enactment of the HSA, Congress created DHS and transferred most immigration functions formerly performed by INS to DHS and its components, including U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and ICE. *See* HSA; Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542). Notably, Congress transferred to ORR the responsibility for the care of any UAC "who [is] in Federal custody by reason of [his or her] immigration status." 6 U.S.C. §§ 279(a), (b)(1)(A). The HSA also transferred to ORR the responsibility for making all placement decisions for UACs, required ORR to coordinate these

---

[1] An "unaccompanied alien child" is defined as a child who "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody. 6 U.S.C. § 279(g)(2).

REPORT AND RECOMMENDATION - 3

placement decisions with DHS, and required ORR to ensure that UACs are not released upon their own recognizance. *See* 6 U.S.C. §§ 279(b)(l)(C), (D), (b)(2).

**B.     The Trafficking Victims Protection Reauthorization Act of 2008**

The TVPRA, which was signed into law on December 23, 2008, contains statutory protections relating to UACs and codified protections related to the processing and detention of UACs. The TVPRA built on the split of duties in the HSA and further requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). It also provides that in most instances, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3).

The TVPRA makes clear that HHS is responsible for all placement decisions for UACs in its custody, and for conducting suitability assessments for those placements. 8 U.S.C. § 1232(c). It requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child," and it provides guidelines for the reunification of UACs with their families by HHS. 8 U.S.C. § 1232(c)(2), (3).

The protections TVPRA affords UACs apply after the HHS, in consultation with DHS, determines that the applicant is indeed a child. 8 U.S.C. § 1232(b)(a). Importantly for this litigation, the TVPRA provides:

> The Secretary of Health and Human Services, in consultation with the Secretary of Homeland Security, shall develop procedures to make a prompt determination of the age of an alien, which shall be used by the Secretary of Homeland Security and the Secretary of Health and Human Services for children in their respective custody. At a minimum, these procedures *shall take into account multiple forms of evidence, including the non-exclusive use of radiographs,* to determine the age of the unaccompanied alien.

REPORT AND RECOMMENDATION - 4

8 U.S.C. § 1232(b)(4) (emphasis added).

**C.      ORR's age determination procedures**

Pursuant to § 1232(b)(4), ORR developed age determination procedures for individuals without lawful immigration status.[2] *See* Dkt. 3-2 (Children Entering the United States Unaccompanied : Section 1 (updated Oct. 5, 2015) ("ORR Guide")). The ORR Guide provides that "HHS may make age determinations of [UACs] when they are in HHS custody on a reasonable suspicion that a child in HHS custody is 18 years or older." *Id.* at 8 (ORR Guide § 1.6.1). When conducting age determinations, ORR case managers are directed to seek the following evidence, but information from each category is not required: (1) documentation, such as official government-issued documents and other reliable records that indicate the UAC's date of birth; and (2) statements by individuals who can credibly attest to the age of the UAC, including the UAC (but generally, a UAC's uncorroborated declaration regarding age is not used as the sole basis for an age determination). *Id.* at 8 (ORR Guide § 1.6.2).

When other information is "inconclusive," case managers may use medical age assessment procedures, such as dental maturity assessments using radiographs. *Id.* The ORR Guide provides that a "medical professional experienced in age assessment method(s) must perform the examination, taking into account the individual's ethnic and genetic background." *Id.* The ORR Guide recognizes that "no medical assessment method can determine an exact age [so] best practice relies on the estimated probability that an individual is 18 or older." *Id.* "The examining doctor must submit a written report indicating the probability percentage that the individual is a minor or an adult. . . If an individual's estimated probability of being 18 or older is 75 percent or greater, ORR will refer the individual to DHS." *Id.*

---

[2] ICE developed a matching policy. *See* Dkt. 6-2.

REPORT AND RECOMMENDATION - 5

# FACTUAL BACKGROUND

**A.     Petitioner's arrival in the United States**

Petitioner is a native and citizen of Somalia. *See* Dkt. 1-4. On August 16, 2015, he arrived at the B&M International Bridge in Brownsville, Texas, and applied for admission into the United States as a political asylee. Dkt. 1-3 at 1. He indicated to DHS officials that he was born in May 1998, and was 17 years old. Dkt. 1-4 at 3. Petitioner reported that his father was murdered in 2008, likely by the militant group Al-Shabaab, and that in May 2009, his mother sent him to South Africa for his safety. *Id.* at 4, 8. There, he lived with an uncle for nearly four years, but decided to depart for the United States after his attempts to obtain asylum were unsuccessful. *Id.* at 4. Petitioner's uncle paid a smuggler to get petitioner to Brazil, and then he made his way north through South and Central America. *Id.* at 9. During this trip, he destroyed his identification documents so that if he was caught, he would not be sent back to Somalia. *Id.* at 6-7.

In light of DHS's determination that petitioner was a UAC, he was transferred to the care and custody of ORR. Dkt. 1 at 6; Dkt. 1-7 at 1. Initially, he was placed in a youth shelter in Chicago, Illinois. Dkt. 1 at 6. Then on October 28, 2015, he was transferred to Portland, Oregon, for long-term placement with a foster family. Dkt. 1-7 at 1. His foster mother, Jeska I. Dalizu, is an immigrant from Africa, who is now a United States citizen. Dkt. 1-10. Petitioner enrolled in high school where his teachers reported that he was a respectful and hard-working student. Dkt. 1-11.

**B.     ORR's age determination**

In November 2015, ORR officials ordered a dental bone scan analysis (radiograph) to verify petitioner's age.[3]  *See* Dkt. 1-10; Dkt. 1-5.  On December 8, 2015, Dr. David Senn of the University of Texas Dental School, performed a radiographic analysis and concluded that the "mean age for a male with third molar development equal to that of [petitioner] is 20.40 plus or minus 3.30 years.  The range of possible ages for such a male is 17.10 to 23.70 years.  The empirical statistical probability of [petitioner] having attained 18 years of age is 92.55%."  Dkt. 1-5.  Based on Dr. Senn's conclusion, ORR determined that petitioner was already 18 years old.  Dkt. 1-8 at 1.  Dr. Senn's radiographic analysis is the only evidence in the record suggesting that petitioner was not born in May 1998, as he maintains.

**C.     Petitioner's transfer to ICE custody**

On or about December 10, 2015, ORR transferred petitioner to the custody of ICE officials in Portland, Oregon.  *See* Dkt. 1-7 at 2.  He was then transferred to the Northwest Detention Center, an adult detention facility.  *See id.* at 3.  On February 3, 2016, petitioner was paroled into the United States and released on his own recognizance.  Dkt. 6-1 at 1.  He returned to the care of Ms. Dalizu.[4]  Dkt. 8-2.  On February 4, 2016, petitioner reported to the Portland ICE office as instructed and was placed on electronic monitoring.  Dkt. 6-1 at 1.  ICE officials informed petitioner that if he provides evidence of enrollment in school, ICE will discontinue

---

[3] According to Ms. Dalizu, petitioner had two dental tests over the span of three weeks because the first test "did not show any results."  Dkt. 1-10.  Ms. Guadarrama also understood that two dental exams were conducted and the first was "inconclusive."  Dkt. 1-8.  The record does not establish, however, whether the first test was an inconclusive age analysis or whether it was merely an unusable set of x-rays.

[4] Because petitioner is no longer in ORR custody, Ms. Dalizu will not receive the modest stipend she previously received for his care.  Dkt. 8-2.

REPORT AND RECOMMENDATION - 7

1  electronic monitoring and enter an order of supervision, requiring him to periodically report in
2  person to the Portland ICE office.  *Id.*

3  **D.      Petitioner's immigration and dependency proceedings**

4  At the time petitioner entered the country, he was placed in removal proceedings as an
5  immigrant without valid entry documents[5] and as an unaccompanied minor likely to become a
6  public charge.  Dkt. 1-3 at 1.  Denisse Guadarrama, an attorney from Immigration Counseling
7  Services in Portland, Oregon, was appointed to represent him in these proceedings.  Dkt. 1-7 at
8  1.  Ms. Guadarrama has indicated that petitioner is eligible for a Special Immigrant Juvenile
9  ("SIJ") status[6] visa and for asylum.  *Id.*  The next hearing in petitioner's immigration proceeding
10 is scheduled for April 21, 2016.  Dkt. 17-1 at 1.

11 To apply for SIJ status, petitioner must first be declared dependent by a state court.  8
12 U.S.C. § 1101(a)(27)(J).  Jennifer Stoller, an attorney with Youth, Rights, and Justice, in
13 Portland, Oregon, was appointed to represent him in dependency proceedings.  Dkt. 1-9 at 1.  On
14 November 23, 2014, she filed a dependency petition on his behalf in Multonomah County
15 Juvenile Court.  *Id.*  Trial is scheduled for March 14, 2016.  *Id.*  Once petitioner turns 18, the
16 state court loses jurisdiction over his petition.  ORS 419B.100(1).

17 Petitioner bears the burden of proving the grounds for dependency jurisdiction under
18 ORS 419B.100, including the requirement that he is under the age of 18.  Dkt. 8-1 at 2.  The

---

[5] The State Department recognizes that birth certificates, passports, and other identification documents are unavailable to Somali citizens due to the lack of a functioning government.  *See* http://travel.state.gov/content/visas/en/fees/reciprocity-by-country/SO.html (last visited Feb. 17, 2016).

[6] SIJ status covers a UAC (1) who has been declared dependent by a juvenile court in the United States, or who has been placed by such court in the custody of a state agency or other individual or entity, and (2) whose reunification with one or both parents is not viable due to abuse, neglect, abandonment, or a similar basis found under state law.  *See* 8 U.S.C. 1101(a)(27)(J).

REPORT AND RECOMMENDATION - 8

Multonomah County District Attorney's Office is opposing the dependency petition on the basis of petitioner's age, and the Deputy District Attorney assigned to the case has indicated that she intends to call Dr. Senn as a witness. *Id.* at 1.

**E.     The instant habeas action**

On January 28, 2016, while petitioner was still detained at the Northwest Detention Center, he initiated the instant habeas action through counsel. Dkt. 1. On February 1, 2016, he filed the motion for temporary restraining order that is currently before the Court. Dkt. 3. As noted above, the relief he seeks is (1) immediate return to his foster family and (2) an order barring respondents from relying on ORR's age determination in either the state dependency proceedings or any immigration application before DHS or the Executive Office for Immigration Review ("EOIR"). Dkt. 3 at 21. The motion is fully briefed and ripe for a determination.

## DISCUSSION

**A.     Legal standard for temporary restraining order**

The standard for issuing a temporary restraining order is the same as that for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). A plaintiff may also qualify for a preliminary injunction by showing that there are serious questions going to the merits of his claim and that the balance of hardships tips sharply in his favor, so long as the irreparable harm and the public interest factors in *Winter* are also met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

1   A request for a mandatory injunction seeking relief well beyond the status quo is
2   disfavored in the law and shall not be granted unless the facts and law clearly favor the moving
3   party. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319-20 (9th Cir. 1994). In general, mandatory
4   injunctions should not be granted "unless extreme or very serious damage will result" and should
5   not be issued "in doubtful cases or where the injury complained of is capable of compensation in
6   damages." *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979); *see also Little v.
7   Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (stating that "the movant must make a heightened
8   showing of the four factors" (citation and quotation marks omitted)).

**B.     Likelihood of success on the merits**

Petitioner's primary legal arguments are (1) ORR's determination of his age violates the TVPRA, (2) ORR's policy for using radiographic age determinations, as pronounced in the ORR Guide, violates the TVPRA, and (3) respondents unlawfully placed him in DHS custody because he is a minor.[7] Dkt. 3 at 8-14. Respondents do not provide a substantive response to these arguments. Dkt. 6 at 10. As discussed below, the Court concludes that petitioner has a strong likelihood of success on these claims.

The TVPRA required HHS and DHS to develop procedures that "[a]t a minimum . . . take into account multiple forms of evidence, including the *non-exclusive use of radiographs*, to determine the age of [a UAC]." 8 U.S.C. § 1232(b)(4) (emphasis added). Congress's mandate that radiographs not be the only basis for an age determination reflects concern about the reliability of such determinations. In 2009, the Office of Inspector General for DHS released a report that acknowledged the House Appropriations Committee had previously "expressed

---

[7] Petitioner raises two additional arguments—that respondents violated the provisions of the ORR Guide in initiating the age determination in the first place and unlawfully detained him with adults—that the Court need not address in order to determine petitioner's likelihood of success. If petitioner would like these claims to be considered with the merits of his habeas petition, he may raise them again in the additional briefing ordered by the Court below.

REPORT AND RECOMMENDATION - 10

concern that ICE was relying on radiographs for age determinations for aliens in its custody, and questioned the reliability of radiographic evidence that ICE uses when determining whether an individual is an adult or juvenile." Dkt. 1-6 at 10. The report recognized that "radiographs of a person's bones or teeth . . . cannot produce a specific age due to a range of factors affecting an individual's growth," including normal biological variation, cultural and ethnic differences, the timing of puberty, diet, genetics, health, and geography. *Id.* at 6. The report also stated, "Medical professionals we spoke with expressed skepticism that a radiographic exam could be used to discover specifically whether an individual has attained 18 years of age. However, they did generally agree that radiographic exams could provide a usable age range." *Id.*

Despite these concerns and the plain language of the TVPRA, the ORR Guide does not prohibit the exclusive use of radiographs. *See* Dkt. 3-2 at 7-9 (ORR Guide § 1.6). Rather, it permits radiographs "if other information is inconclusive." *Id.* at 8 (ORR Guide § 1.6.2). The ORR Guide provides that if a radiographic analysis estimates a 75% or greater probability that the individual is 18 years old, the individual will be referred to DHS and treated as an adult. *Id.* Thus, not only does the ORR Guide allow age determinations to be based exclusively on radiographs, it allows for a finding that an individual is over 18 even where the radiographic analysis does not rule out the possibility that the individual is a minor.

In this case, the undisputed evidence is that ORR relied exclusively on Dr. Senn's radiographic analysis in determining petitioner to be over 18 years old. *See* Dkt. 1-8 at 1 (12/11/2015 email from ORR's Federal Field Specialist to Ms. Guadarrama); Dkt. 1-5 (Dr. Senn's radiographic analysis). By its terms, the ORR Guide permits such exclusive reliance. *See* Dkt. 3-2 at 7-9. Based on the plain language of the TVPRA requiring the non-exclusive use of radiographs, the Court concludes that petitioner has a strong likelihood of success on the merits of his claim that ORR's age determination is invalid under the TVPRA and that the ORR

REPORT AND RECOMMENDATION - 11

Guide contravenes the statute. As such, petitioner also has a strong likelihood of success on his claim that respondents unlawfully placed him in DHS custody.

**C.    Likelihood of irreparable harm**

   **1.    Request for release**

In his motion, petitioner argues that he is likely to suffer irreparable harm if he is not released from immigration detention because his absence prevents Ms. Stoller from moving forward with his dependency case in state court. Dkt. 3 at 16. As respondents argue, however, this claim of irreparable harm is no longer supported given that petitioner has returned to his foster family and may now proceed with his dependency case.

In his reply, petitioner asserts irreparable harm based on the loss of resources his foster mother previously received from ORR. Dkt. 8 at 5. Ms. Dalizu has submitted a letter stating, "I was being given a stipend of $1,100.00 for taking care of [petitioner] and I did all the rest. I would appreciate if this stipend can be restored." Dkt. 8-2. She further states, "It would be good to receive some assistance to help with his transport, medical, and minor upkeeps." *Id.*

While courts have recognized that a loss of public assistance benefits can constitute irreparable harm, *see, e.g.*, *Beno v. Shalala*, 30 F.3d 1057, 1063 n.10 (9th Cir. 1994) (collecting cases under the "possibility of irreparable harm" standard that preceded *Winter's* higher "probability of irreparable harm" standard), Ms. Dalizu's statement is insufficient to establish a likelihood of irreparable harm, much less the heightened standard for a mandatory injunction that changes the status quo. *See Anderson*, 612 F.2d at 1115 ("extreme or very serious damage" required for mandatory injunction). The Court has no doubt that restoration of the stipend would be helpful, but there is no evidence in the record that Ms. Dalizu is unable to care for petitioner without the stipend, that she would refuse to do so, or that the absence of the stipend has caused

REPORT AND RECOMMENDATION - 12

irreparable harm to her or petitioner. As such, petitioner has not met his burden of establishing a likelihood of irreparable harm absent his immediate return to ORR custody.

### 2. Request for order preventing reliance on ORR's age determination

Petitioner argues that absent an order from this Court, it is likely he will not be able to move forward at his dependency trial because the state court will only exercise jurisdiction if he can demonstrate that, contrary to ORR's determination, he has not already turned 18. Dkt. 8 at 4. In support of this claim, petitioner points to the fact that the Deputy District Attorney assigned to his dependency case intends to call Dr. Senn as a witness. *Id.* (citing Dkt. 8-1 at 1). Petitioner also maintains that if he is able to prevail in the dependency proceedings, DHS could still independently determine he is not eligible for relief unless this Court enjoins reliance on the age determination in future proceedings. *Id.* at 5.

While the Court is sympathetic to petitioner's situation, he does not establish a likelihood of irreparable harm absent a temporary restraining order. Petitioner asks the Court to "order *respondents* to refrain from applying or relying on in any form, the unlawful age determination to petitioner, either with respect to his dependency proceedings or with any application before [DHS] or [EOIR]." Dkt. 3 at 21 (emphasis added). There is no evidence establishing a likelihood that this relief, if granted, would change the course of the state court dependency proceedings. Respondents in this action are federal employees or agencies, none of whom have been asked to testify at the dependency proceedings. Dr. Senn, who is not a respondent in this action, may be called as a witness, but the Court cannot, nor would it, prevent him from testifying to the results of his radiographic analysis. *Cf. Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 431 (2010) ("Comity . . . serves to ensure that 'the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.'") (citation

REPORT AND RECOMMENDATION - 13

omitted). The fact that ORR requested and obtained the radiographic analysis—as an issue separate and apart from ORR's determination that petitioner is over 18—is a bell that cannot be un-rung.

Finally, although DHS or EOIR may at some point in the future seek to rely on ORR's age determination in petitioner's immigration proceedings, there is no evidence that they will do so immediately or before this action can be resolved in the regular course of litigation. Indeed, this Court will have the ability to decide the merits of petitioner's habeas petition after the state dependency trial but before petitioner's next birthday.

For these reasons, the Court concludes that petitioner has not shown a likelihood of irreparable harm.

**D.     Public interest and balance of equities**

Where the government is the opposing party, the public interest and balance of equities factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he public interest favors applying federal law correctly." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011); *see also N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest."). As discussed above, petitioner has established a strong likelihood of success on the merits of his claim that respondents have violated the TVPRA. Accordingly, the public interest and balance of equities weigh in his favor.

**E.     Summary of *Winter* factors**

In sum, petitioner has shown a strong likelihood of success on the merits of his claims that ORR's age determination violates the TVPRA, that ORR's policies for relying on radiographic analysis for age determinations violates the TVPRA, and that his placement in DHS custody is unlawful. Likewise, the public interest and balance of equities tip in his favor. Nevertheless, he has not shown that the grant of a temporary restraining order would alleviate a

REPORT AND RECOMMENDATION - 14

likelihood of irreparable harm.  Because petitioner has not made a showing of all four essential elements of a temporary restraining order, his motion should be denied.

### **BRIEFING SCHEDULE ON MERITS OF HABEAS PETITION**

On or before **March 18, 2016**, respondents shall show cause why a writ of habeas corpus should not be granted by filing a return as provided in 28 U.S.C. § 2243.  As a part of such return, respondent(s) shall submit a memorandum of authorities in support of their position, and should state whether an evidentiary hearing is necessary.

Because the parties have already submitted substantial briefing in this action, the Court will expedite briefing on respondents' return.  On the face of the return, respondents shall note it for consideration on the **third Friday** after it is filed, and the Clerk shall note the return accordingly.  Petitioner may file and serve a response not later than the Monday immediately preceding the Friday appointed for consideration of the matter, and respondents may file and serve a reply brief not later than the noting date.

### **CONCLUSION**

For the foregoing reasons, the Court recommends that petitioner's motion for temporary restraining order, Dkt. 3, be DENIED.  A proposed Order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **March 4, 2016**.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **March 11, 2016.**

REPORT AND RECOMMENDATION - 15

This Report and Recommendation is not an appealable order. Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

DATED this 19th day of February, 2016.

JAMES P. DONOHUE
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 16